Argued and submitted December 4, 1979, reversed April 8,
petition for rehearing denied May 1, 1980

# JACKSON COUNTY,
*Respondent,*

*v.*

# COMPTON, et al,
*Petitioners,*

(CA 11316, SC 26476, SC 26483)

609 P2d 1293

William B. Wyllie, Salem, argued the cause and filed briefs for petitioners Compton.

Michael J. Morris, Portland, argued the cause for petitioner First State Bank of Oregon. With him on the briefs was J. Rion Bourgeois, and Evans, Hall & Grebe, P.C., Portland.

Thomas J. Owens, Medford, argued the cause and filed a brief for respondent.

HOWELL, J.

### HOWELL, J.

This is a declaratory judgment proceeding filed by plaintiff, Jackson County (herein "County"), seeking a determination that the County is the owner and is entitled to possession of certain stockpiled gravel. The defendants are Betty K. Compton and John Compton ("Comptons"), the owners of the real property upon which the gravel is located; First State Bank of Oregon ("Bank"); and Thomas E. Whittle ("Whittle"), who did not appear and is no longer involved as a party. The trial court entered a summary judgment in favor of defendants. On appeal, the Court of Appeals reversed, and we granted review.

On October 20, 1971, defendant Whittle, the original owner of the real property, entered into an agreement with Jackson County for the processing and removal of river run rock from Whittle's property. The agreement stated, in part:

> "(1) The owners [Whittle] hereby agree that the County Road Department may enter upon such portions of their land described above as may be necessary to remove said deposits of river run rock, * * *.
>
> " * * * * *.
>
> "(3) The owners further agree that the County Road Department may locate and operate upon their premises such equipment as may be necessary to remove and process said rock in the most efficient manner, and that the County may use such existing roads and bridges as may be convenient to the County.
>
> "(4) The owners further agree that any rock manufactured by the County Road Department on the owners' premises shall be paid for at that time and will belong to the County Road Department and may be stockpiled on the premises of the owners. The County shall have the continuing right to remove said stockpiled rock until this agreement expires on January 1, 1974. * * * "

Later the agreement was extended to January 1, 1976.

Prior to the termination date and on March 21, 1975, Whittle conveyed the real property to the Bank. The deed contained the clause:

> "* * * without limitation, all of the rents and profits thereof from and after the date hereof * * * reserving unto Grantor no interest whatsoever in the aforesaid real property or the rents and profits thereof."

After Whittle conveyed to the Bank, he apparently made some assurances to the County that the County owned the gravel. However, the County knew about the conveyance from Whittle to the Bank and, in a letter dated July 18, 1975, an agent for the County wrote to Whittle stating, in part: "I will be happy to discuss a gravel purchase agreement with the new owners at their convenience."

On December 31, 1975, the Bank sold the real property to the Comptons on contract. After January 1, 1976, the extended expiration date of the County-Whittle agreement, the Comptons refused to allow the County to remove the stockpiled gravel from the premises, and the County filed this declaratory judgment proceeding.

1. The terms of the agreement between Whittle and the County describe the grant of a "profit à prendre" or "profit." A profit à prendre is the right to acquire, by severance or removal from another's land, some thing or things previously constituting a part of the land. 3 Tiffany, Real Property 427, § 839 (3d ed 1939, Jones ed); 1 Thompson, Real Property 523, § 139 (Grimes 1964); Hahner, *An Analysis of Profits A Prendre*, 25 Or L Rev 217, 221, 227 (1946). *See also High v. Davis*, 283 Or 315, 322, 584 P2d 725 (1978); *Bingham v. Salene*, 15 Or 208, 214 (1887). Profits include the right to take gravel, stone or minerals from another's land and the right to enter, cut and remove timber from another's land. Tiffany, *supra* at 428; Thompson, *supra* at 510, § 135; Hahner, *supra* at 218-19 n. 5. *See also Babler Bros., Inc. v. Hebener*, 267 Or 414, 418 n. 1, 517 P2d 653 (1973) (rock); *Gray v. Handy*, 349

Mass 438, 208 NE 2d 829 (1965) (sand); *Beckwith v. Rossi,* 157 Me 532, 175 A2d 732 (1961) (gravel). *Cf. Paullus v. Yarbrough et ux,* 219 Or 611, 639-40, 347 P2d 620 (1959)(timber); Falk, Timber and Forest Products Law 38, § 36 (1958); Note and Comment, 34 Or L Rev 256, 258-59 (1955).

The Restatement of Property describes a profit as being similar to an easement and subject to the same rules as easements. Restatement of Property § 450, *Special Note* (1944). The Restatement goes on to explain that a profit is an easement that may include

> "the privilege to acquire, through severance, ownership of some part of the physical substances included in the possession of the land subject to the easement. * * *. The rights in the physical substance severed are changed from interests in land owned by the owner of the land subject to the easement to interests in chattels personal owned by the owner of the easement." *Id.* at comment *f.*

The duration of a profit à prendre depends on the original terms of the grant creating the right. Thompson, *supra* at 527, § 140; Hahner, *supra* at 244. By the terms of the agreement between Whittle and the County, as extended, the grant of the profit to take the river run rock would expire on January 1, 1976. The agreement also specified that the County would no longer have a continuing right to remove stockpiled rock after that date. Previous decisions of this court and other courts indicate a general rule with regard to removal date provisions in agreements to enter, sever, and remove physical substances—such as timber, coal and gravel—from another's land.

In *Sandy Holding Co. v. Ferro,* 144 Or 466, 25 P2d 561 (1933), the defendant claimed the right to cut and remove timber from plaintiff's land based on a contract that limited the right of removal to a specific term. The contract did not specify what would happen to timber cut but not removed before the removal date. We held the following:

"The contract under which the defendant claims merely granted his predecessor in interest the right to remove the timber before a certain date. So much of the timber as was removed by him before the date fixed in the contract, or any extension thereof, would belong to him. *Such of the timber as had not been removed by him, although cut, within the time agreed upon, would belong to the owner of the land, and the defendant would have no interest therein.* The defendant, therefore, had no right to remove any cordwood from plaintiff's land after August 1, 1932, and should account for the value thereof at the place from which it was removed at the time of its removal." 144 Or at 476. (Emphasis added.)

We particularly relied on several prior decisions that a conveyance of timber on the condition that it be removed by a specific date amounts only to a sale of all the timber that the grantee can cut and remove before that date. *See Coquille M. & T. Co. v. Dollar Co.*, 132 Or 453, 285 P 244 (1930); *Kee v. Carver*, 95 Or 406, 187 P 1116 (1920); *Kreinbring v. Mathews*, 81 Or 243, 159 P 75 (1916); *Anderson v. Miami Lumber Co.*, 59 Or 149, 116 P 1056 (1911). In the *Coquille* case we said:

" * * * This court, in harmony with the decisions of other courts, has several times held that when a logging contract specifies a definite term within which the buyer may remove the timber from the land of the seller, his right terminates at the conclusion of the term even though timber remains upon the land and the contract contains no provision for a forfeiture: * * *." 132 Or at 469.

In *Anderson v. Miami Lumber Co., supra*, this court explained that a landowner selling the right to cut timber is most concerned about the time of its removal from the land:

" ' * * * [W]e conclude that it was the intention of the parties that the purchaser should have the three years specified for a removal of the timber whether standing or lying down, and that at the expiration of that time his interest in the timber should cease, and that the title to the timber would then be in the person owning the land. * * * In many of the contracts

which have been construed by the courts the language is 'cut and remove,' but it is evident that the main consideration, even in those cases, is the removal. Just how the removal is to be effected is not of interest to the seller. *The great desideratum to him is the recovery of the possession of his land at the time specified.* * * * All these technical questions have been determined by this court in *Lehtonen v. Marysville & Power Co.*, 50 Wash. 359 (97 Pac. 292). * * * There it was said: "Whether the reservation of the timber made it, in legal effect, personal property or otherwise, makes no difference. * * * The contract of reservation provides that it shall be removed within the given time. *If it was the intention of the parties that the timber might be removed after that time, the limitation means nothing, and was misleading."* * * * Certainly the respondent cannot escape the important provision providing the time within which he is permitted to remove the timber. He knew that, under the plain provisions of his contract—and it is difficult to see how it could be made plainer—he had three years from the date of the contract in which to removed the timber. His action in cutting more than he could or would remove in that time was an evasion of both the letter and spirit of his contract, and he must suffer the consequences of his own failure to comply with the contract. * * * ' " 59 Or at 158-59, *quoting from Allen & Nelson Mill Co. v. Vaughn*, 57 Wash 163, 168-70, 106 P 622 (1910). (Emphasis added)

More recently, in *Dunham et ux v. Taylor et al*, 211 Or 618, 317 P2d 926 (1957), we interpreted a contract for the sale of standing timber that contained a provision that the timber be cut and removed by a specific date. The contract also expressly provided that the purchasers would forfeit all interest in the timber remaining after the termination date. We said:

"A contract for the sale of timber on a given tract of land with a proviso that it shall be removed prior to a time specified while vesting a present title in the grantee or vendee, is an estate upon condition liable to be defeated within the time specified. * * *

"The law is well settled that the interest of a purchaser under a timber contract of sale stipulating

for removal within a specified period, terminates at the expiration date of the sales contract even though the purchaser, as here, has paid the consideration required by the contract. * * * " 211 Or at 625.

The importance of the specific removal date provision has been recognized in coal leases and gravel contracts as well as timber contracts. In *Boron v. Smith*, 380 Pa 98, 110 A2d 169, 48 ALR2d 1170 (1955), the plaintiff was the lessee of certain coal lands of the defendants under a lease that conferred the right to mine and remove coal for a term of ten years. The plaintiff argued that the lease constituted a sale of the coal in place for which the plaintiff had fully paid royalties during the term and that he was, therefore, entitled to remove the remaining unmined coal after the expiration of the lease. The court stated:

"Even if the plaintiff paid royalties (including the monthly minimums) during the term in an amount in excess of the total royalties due or to become due for all of the mineable coal in the leased property, still it was the plaintiff's duty to mine and remove the coal during the term of the lease. For, while the instrument granting the right to mine the coal in the lands of the grantors, even though denominated a lease, constituted a sale of the coal in place, the transaction was conditioned upon the coal's being removed by the grantee within the specified term of the lease. * * * The term of the lease was a limitation on the lessee's estate and was of the essence of the agreement. * * * The appellant, not having validly renewed the lease, was without any right to mine and remove coal from the demised premises after the expiration of the fixed term." 110 A2d at 171.

Similarly, in *Tamko Asphalt Products, Inc. v. Fenix*, 321 SW2d 527 (Mo Ct App 1958), the defendant's grantor had sold to the plaintiff's assignor all the chat (gravel) on a specific section of land, provided that the buyer remove all the chat on or before a specific removal date. After the removal date and the contract had expired, the plaintiff sought to enter defendant's land and remove the chat. Recognizing

that the chat pile was sold as personal property, the court held that plaintiff's

> " * * * title to that portion of the chat pile not removed during the ten-year term of the contract was defeasible and has revested in the landowner, defendant Fenix." 321 SW 2d at 536.

■ Accordingly, we conclude that Whittle and the County agreed to a specific time for allowing the County to enter the land, process the rock, and remove the rock. By agreeing to a specific removal date, the County's ownership of stockpiled rock was defeated by the County's failure to remove the rock that remained on the land after the removal date.[1] *See Rayburn et ux. v. Crawford et ux.*, 187 Or 386, 393, 211 P2d 483 (1949); *Sandy Holding Co. v. Ferro, supra* at 475-76; *Coquille M. & T. Co. v. Dollar Co., supra* at 469; *Anderson v. Miami Lumber Co, supra* at 151.

The County contends, however, that if it no longers owns the rock, then the rock belongs to Whittle. And, when Whittle deeded the land to the Bank, he never conveyed the rock, which was personal property upon severance from the land. The County argues that because Whittle, after he had deeded the land to the Bank, assured the County that he would extend the removal date, Whittle is estopped to deny any rights of the County in the stockpiled rock.

■■ We do not agree with the County's contention that the stockpiled rock belongs to Whittle. The fact that the stockpiled rock became personal property is immaterial. Whittle did not sell the County personal property; he sold the County the profit to take rock, which is a real property interest. *High v. Davis,*

---

[1] The instant case does not involve a forfeiture. The County had a specific term during which it was allowed to remove stockpiled rock. After the term of the agreement expired, the County's rights merely expired. *Sandy Holding Co. v. Ferro*, 144 Or 466, 474-76, 25 P2d 561 (1933); *Kee v. Carver*, 95 Or 406, 187 P 1116 (1920); *Anderson v. Miami Lumber Co.*, 59 Or 149, 158-59, 116 P 1056 (1911); *Boron v. Smith*, 380 Pa 98, 110 A2d 169, 172, 48 ALR2d 1170 (1955); *Tamko Asphalt Products, Inc. v. Fenix*, 321 SW2d 527 (Mo Ct App 1958); *Hedin v. Roberts*, 16 Wash App 740, 559 P2d 1001 (1977).

*supra,* 283 Or at 322; Hahner, *supra* at 218, 222-23, 227, 233. Whittle's sale of the profit to take the rock created an encumbrance on the land because the profit included the right, in the nature of an easement, to enter the land to process, stockpile and remove rock. *Cf. Forsyth v. Nathansohn,* 139 Or 632, 637-38, 9 P2d 1036, 11 P2d 1065 (1932); *Kreinbring v. Mathews, supra* 81 Or at 249; *Hedin v. Roberts,* 16 Wash App 740, 559 P2d 1001 (1977); Restatement of Property § 450, *Special Note,* comment *f;* Thompson, *supra* at 525-26, § 139; Hahner, *supra* at 217-27. On January 1, 1976—after Whittle had conveyed all of his real property interests in the land to the Bank and the Bank had sold the land to the Comptons—the County's profit terminated, the encumbrance on the Comptons' land expired, and neither the County nor Whittle had any right to enter the Comptons' land and remove the rock. Therefore, the stockpiled rock remaining on the land belongs to the Comptons. *Sandy Holding Co. v. Ferro, supra,* 144 Or at 476; *Anderson v. Miami Lumber Co., supra,* at 158-59; *Tamko Asphalt Products, Inc. v. Fenix, supra* at 536; *Hedin v. Roberts, supra,* 559 P2d at 1002-03.

Accordingly, we hold that neither the County nor Whittle has any interest in the stockpiled rock that remained on the Comptons' land after January 1, 1976. The trial court did not err in granting summary judgment to the Bank and the Comptons.

The decision of the Court of Appeals is reversed.